UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA,

          Plaintiff,

v.

Jerald Robert Cobenais,

          Defendant.

Case No. 23-cr-296 (PJS/LIB)

**ORDER AND
REPORT AND RECOMMENDATION**

Pursuant to a general assignment made in accordance with 28 U.S.C. § 636, this matter comes before the undersigned United States Magistrate Judge upon the parties' various pretrial Motions. The Court held a Motions Hearing on November 30, 2023, regarding the parties' pretrial Motions for the discovery of evidence, as well as, Defendant's Motion to Suppress Statements. (Minutes [Docket No. 37]).

At the Motions Hearing, the parties requested, and were granted, the opportunity to submit supplemental briefing. Upon the completion of that briefing, Defendant's Motion to Suppress Statements, [Docket No. 24], was taken under advisement. (See gen., Docket No. 44).

For the reasons discussed herein, the Government's Motion for Discovery, [Docket No. 17], is **GRANTED**; Defendant's Motion for Disclosure of 404(b) Evidence, [Docket No. 25], is **GRANTED**; Defendant's Motion for Early Disclosure of Jencks Act Material, [Docket No. 26], is **DENIED**; Defendant's Motion for Discovery and Inspection, [Docket No. 27], is **GRANTED**; Defendant's Motion for Government Agents to Retain Rough Notes and Evidence, [Docket No. 28], is **GRANTED**; Defendant's Motion for Rule 16 Discovery Regarding Forensic Testing, [Docket No. 29], is **GRANTED**; and Defendant's Motion to Compel Attorney for the Government to Disclose Evidence Favorable to the Defendant, [Docket No. 30], is **GRANTED**.

Further, for reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Statements, [Docket No. 24], be **DENIED**.

## I.    Background and Statement of Facts

### A.  Background

Defendant is charged with one (1) count of aggravated sexual abuse in violation of 18 U.S.C. §§ 2241(a)(1), 1151, and 1153(a), as well as, one (1) count of sexual abuse in violation of 18 U.S.C. §§ 2242(2), 1151, and 1153(a). (Indictment [Docket No. 1]).

## II.   Government's Motion for Discovery. [Docket No. 17].

The Government seeks discovery pursuant to Rules 16(b), 12.1, 12.2, 12.3, and 26.2 of the Federal Rules of Criminal Procedure, as well as, Rules 702, 703, and 705 of the Federal Rules of Evidence. (See Gov't's Mot. for Discovery [Docket No. 17]).

### A.  Inspection and Copying Pursuant to Rule 16(b)

#### 1.  Documents and Tangible Objects

The Government requests that the Court order Defendant to permit inspection and copying of all books, papers, documents, photographs, tangible objects, or copies or portions thereof, which are within the possession, custody, or control of Defendant and which Defendant intends to introduce as evidence in his case-in-chief at trial.

Defendant did not object to the request. The motion is **GRANTED**, and Defendant shall disclose any such responsive materials no later than fourteen (14) days before trial.

#### 2.  Reports of Examinations and Tests

The Government further requests all results and reports of physical or mental examinations and of scientific tests or experiments made in connection with the above captioned matter, or copies thereof, within the possession or control of Defendant, which Defendant intends

to introduce as evidence in his case-in-chief at trial or which were prepared by a witness whom Defendant intends to call at trial.

Defendant did not object to this request. The motion is **GRANTED**, and Defendant shall disclose any such responsive materials no later than fourteen (14) days before trial.

### 3. Expert Testimony

The Government also seeks a written summary of expert testimony Defendant intends to use under Rule 702, 703, and 705 of the Federal Rules of Evidence as evidence at trial. The Government asserts that the summary must describe the opinions of the expert witnesses, the basis and reasons therefore, and the witnesses' qualifications.

The Government requests that such expert disclosures for both parties be made thirty days before trial with rebuttal expert reports being produced no later than ten days before trial. Defendant did not object to this request.

The motion is **GRANTED**. Defendant shall disclose any responsive materials for experts he intends to call in his case-in-chief at trial no later than thirty (30) days before trial. Defendant shall disclose any responsive materials related to expert reports in rebuttal to any Government disclosed experts no later than ten (10) days before trial.

### B. Notice of Alibi Defense

Pursuant to Federal Rule of Criminal Procedure 12.1, the Government seeks an Order from the Court requiring Defendant, if he intends to claim alibi as a defense, to state the specific place or places at which Defendant claims to have been at the time of the alleged offenses in the above captioned matter and the names and addresses of the witnesses upon whom Defendant intends to rely to establish such alibi.

Defendant did not object to this request. The motion is **GRANTED**, and Defendant shall give notice of same pursuant to Rule 12.1 as soon as practicable and in no event later than twenty-one (21) days before trial.

### C. Notice of Insanity/Mental Illness Defense

In addition, pursuant to Federal Rule of Criminal Procedure 12.2, the Government requests the Court to order Defendant, if he intends to rely upon the defense of insanity or introduce expert testimony relating to a mental disease or defect or any other mental condition of Defendant relevant to the issue of guilt, to provide the Government notice of such defense.

Defendant did not object to this request. The motion is **GRANTED**, and Defendant shall give notice of same pursuant to Rule 12.2 as soon as practicable and in no event later than twenty-one (21) days before trial.

### D. Public Authority

Furthermore, pursuant Federal Rule of Criminal Procedure 12.3, the Government seeks an Order from the Court requiring Defendant, if he intends to rely upon the defense of actual or believed exercise of public authority, to notify the Government of the agency involved and the time during which Defendant claims to have acted with public authority.

Defendant did not object to this request. The motion is **GRANTED**, and Defendant shall give notice of same pursuant to Federal Rule of Criminal Procedure 12.3 as soon as practicable and in no event later than twenty-one (21) days before trial.

### E. Witness Statements

The Government seeks all statements within Defendant's possession or control of any witness that Defendant intends to call in connection with a suppression hearing, detention hearing, trial, or sentencing.

Defendant did not object to this request. The motion is **GRANTED**. To the extent Defendant has statements in his possession or control of any witness that he intends to call to testify in connection with a suppression hearing, detention hearing, trial, or sentencing, Defendant shall disclose such statements to the Government no later than three (3) days before such witness is called to testify.

### III. Defendant's Pretrial Motion for Disclosure of 404(b) Evidence. [Docket No. 25].

Defendant seeks disclosure of any "bad act" or "similar course of conduct" evidence that the Government intends to offer at trial pursuant to Federal Rule of Evidence 404(b). (See Def.'s Mot. to Disclose 404(b) Evidence [Docket No. 25]).

In its written response, the Government acknowledged its obligation to comply with Rule 404(b). The Government suggests that disclosures be made no later than two weeks before trial.

In relevant part, Rule 404(b)(3) provides that the Government must "provide reasonable notice of any" Rule 404(b) "evidence that the prosecutor intends to offer at trial, so that the defendant has a fair opportunity to meet it." Fed. R. Evid. 404(b)(3)(A). In that notice, the Government must also "articulate . . . the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose." Fed. R. Evid. 404(b)(3)(B).

Defendant's Pretrial Motion for Disclosure of 404(b) Evidence, [Docket No. 25], is **GRANTED**, as set forth herein. The Court orders the Government to disclose to the Defense as soon as practicable, and in no event later than twenty-one (21) days before trial, formal notice of any specific 404(b) evidence it intends to offer, as well as, the purpose for which it intends to offer it into evidence at trial.[1]

---

[1] Federal Rule of Evidence 404(b) does not extend to evidence of acts which are "intrinsic" to the charged offense. United States v. Adediran, 26 F.3d 61, 63 (8th Cir. 1994) (standards applicable to evidence considered under Rule 404(b) do not apply to such "inextricably intertwined" evidence); see United States v. Williams, 900 F.2d 823 (5th Cir. 1990).

IV.    **Defendant's Motion for Early Disclosure of Jencks Act Material. [Docket No. 26].**

Defendant moves the Court for an Order requiring the Government to disclose Jencks Act materials before trial. (See Def.'s Mot. [Docket No. 26]).

The Government objects to Defendant's request arguing that it cannot be <u>required</u> to make pretrial disclosure of Jencks Act materials.

The Court recognizes the practical effect that disclosing Jencks Act materials only after a witness has actually testified in the Government's case-in-chief creates the prospect for unnecessary continuances and delays in the trial while the Defense is permitted a reasonable time to review the late disclosures. However, Defendant provides no citation to authority which would allow the Court to <u>require</u> early disclosure of Jencks Act material. Generally, the case law provides that the Court may not require the Government to make early disclosure of Jencks Act material. <u>See, e.g.</u>, <u>United States v. Alexander</u>, 736 F. Supp. 968, 981 (D. Minn. 1990); <u>United States v. White</u>, 750 F.2d 726, 727 (8th Cir. 1984); <u>United States v. Wilson</u>, 102 F.3d 968, 971–72 (8th Cir. 1996).

Accordingly, Defendant's Motion for Early Disclosure of Jencks Act Material, [Docket No. 26], is **DENIED**.[2]

V.    **Defendant's Motion for Discovery and Inspection, [Docket No. 27], and Defendant's Motion for Rule 16 Discovery Regarding Forensic Testing and Experts. [Docket No. 29].**

Defendant seeks disclosure of any written, recorded, or oral statements made by Defendant or copies thereof in the possession, custody, or control of the Government, as well as, a copy of his criminal history. (See Def.'s Mot. for Discovery [Docket No. 27]). Furthermore, Defendant requests permission to inspect and/or copy books, papers, documents, photographs,

---

[2] Nevertheless, the Government voluntarily agreed to provide all Jencks Act materials to the Defense by no later than three (3) business days before trial. (Gov't's Resp. [Docket No. 35] at 10). The Court encourages such voluntarily agreements.

and tangible objects in the possession, custody, or control of the Government and which are material to the preparation of the defense or are intended for use by the Government as evidence in chief at the trial or were obtained from or belonged to the Defendant.

In his Motion for Discovery and Inspection and his Motion for Rule 16 Discovery Regarding Forensic Testing and Experts, Defendant requests permission to inspect and copy the results of any physical or mental examinations or scientific tests or experiments. Defendant also requests written summaries of any expert opinion the Government intends to use in its case-in-chief. Defendant asserts that said summaries should include the expert witnesses' qualifications and opinions, as well as, the basis for those opinions.

In its written response to Defendant's Motions, the Government acknowledged its ongoing discovery obligations under Rule 16. The Government further noted that it is still awaiting the results from DNA forensic testing.

Defendant's Motion for Discovery and Inspection, [Docket No. 27], and his Motion for Rule 16 Discovery Regarding Forensic Testing and Experts, [Docket No. 29], are **GRANTED**, as set forth herein. The Government shall disclose any subsequently acquired materials or information which are specifically responsive to Rule 16 to the Defense as soon as said responsive materials are discovered by the Government and in any event by no later than fourteen (14) days before trial, except with respect to expert disclosures and forensic reports, which shall be disclosed as soon as practicable and in any event by no later than thirty (30) days before trial. Any rebuttal expert reports in response to case-in-chief experts disclosed by the Defense are to be disclosed by the Government no later than ten (10) days before trial.

**VI.    Defendant's Pretrial Motion for Government Agents to Retain Rough Notes and Evidence. [Docket No. 28].**

Defendant also requests an Order from the Court requiring any law enforcement agent to retain and preserve all rough notes taken as part of their investigations, whether or not the contents of such rough notes are incorporated in official records. (See Def.'s Mot. [Docket No. 28]). Defendant further seeks an Order of this Court requiring law enforcement officials to preserve the evidence seized in the course of the Government's investigation of the present case. (Id.).

The Government does not object to Defendant's request for the retention of rough notes and evidence.

Defendant's Motion for Government Agents to Retain Rough Notes and Evidence, [Docket No. 28], is **GRANTED** regarding rough notes as to retention only at this time. If Defendant seeks production or disclosure of rough notes, Defendant will need to bring a separate motion for such production. Defendant's Motion is also **GRANTED** as to the retention of evidence seized in the investigation of the present case. Any such evidence will be produced in accordance with the Federal Rules of Evidence and this Court's Orders.

**VII.    Defendant's Motion to Compel Attorney for the Government to Disclose Evidence Favorable to the Defendant. [Docket No. 30].**

Defendant seeks disclosure of evidence favorable to him which would fall within the authority of Brady v. Maryland, 373 U.S. 83 (1963); Giglio v. United States, 405 U.S. 150 (1972); and their progeny. (See Def.'s Mot. to Compel Attorney for the Gov't to Disclose Evid. Favorable to the Def. [Docket No. 30]).

In its written response, the Government acknowledged its duty to disclose responsive materials and information under Brady, Giglio, and their progeny. The Government asserts that it has already provided certain responsive disclosures.

To the extent it seeks materials responsive to Brady, Giglio, and their progeny, Defendant's Motion to Compel Attorney for the Government to Disclose Evidence Favorable to Defendant, [Docket No. 30], is **GRANTED**, as set forth herein. The Government will disclose any and all remaining or subsequently discovered, obtained, or obtainable material responsive to Brady to the Defense as soon as said responsive materials are discovered by the Government.[3] The Government will disclose materials which are responsive to Giglio and related to the impeachment of the Government's witnesses to be called at trial by no later than seven (7) days before trial or when the presiding trial judge requires disclosure of trial witnesses, whichever is earlier.[4]

## VIII.    Defendant's Motion to Suppress Statements. [Docket No. 24].

Defendant seeks an Order of this Court suppressing his July 7, 2023, recorded statements to law enforcement which he made during an interview with law enforcement at his place of employment. In support of this request, Defendant argues that these statements were obtained in violation of Miranda v. Arizona, 384 U.S. 436 (1966). (Def.'s Mem. [Docket No. 42] at 6–18).

---

[3] In his Motion, Defendant purports to list several categories of information which he believes warrant disclosure under Brady, Giglio, and their progeny, and he ostensibly wishes the Court to order the disclosure of these materials pursuant to Brady, Giglio, and their progeny. However, in Kyles v. Whitley, 514 U.S. 419 (1995), the United States Supreme Court "emphasized the discretion of the *prosecutor*, not the trial judge, in deciding what evidence is producible under Brady." United States v. Garrett, 238 F.3d 293, 304 n.4 (5th Cir. 2000) (emphasis added); see Lingle v. Iowa, 195 F.3d 1023, 1026 (8th Cir. 1999). The Sixth Circuit has also explained that "while the Brady rule imposes a general obligation upon the government to disclose evidence that is favorable to the accused and material to guilt or punishment, the government typically is the sole judge of what evidence in its possession is subject to disclosure." United States v. Clark, 957 F.2d 248, 251 (6th Cir. 1992) (superseded on other grounds as discussed in United States v. Ruiz-Lopez, 53 F.4th 400 (6th Cir. 2022)). That being said, "[i]f [the Government] fails to comply adequately with a discovery order requiring it to disclose Brady material, it acts at its own peril." Id. Accordingly, the Court encourages the Government to carefully evaluate the materials in its possession in light of a liberal understanding of its Brady obligations.

[4] The Government's disclosure of materials responsive to Giglio and related to the impeachment of the Government's witnesses to be called at trial shall include the criminal history, if any, for each trial witness.

### A.  Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444).

"Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (cleaned up) (quoting Rhode Island v. Innis, 466 U.S. 291, 300–01 (1980)); see United States v. McLaughlin, 777 F.2d 388, 390 (8th Cir. 1985). Whether an incriminating response is sought by an officer is objectively determined "from the perspective of [a] suspect" and not by the officer's actual intent. United States v. Richardson, 427 F.3d 1128, 1132 (8th Cir. 2005).

### B.  Facts[5]

On June 18, 2023, law enforcement received a report of sexual assault. (Tr. 7).[6] Defendant was named as a suspect in the sexual assault. (Tr. 7). Shortly thereafter, SA Voss was assigned to the sexual assault investigation. (Tr. 7–8). During the initial part of his investigation,

---

[5] The facts contained in this section are derived from the parties' exhibits admitted in the present case, as well as, the November 30, 2023, Motions Hearing testimony of Paul Voss, a special agent for the Federal Bureau of Investigation ("SA Voss").

[6] Throughout this Order and Report and Recommendation, the Court refers to the transcript of the November 30, 2023, Motions Hearing by the abbreviation "Tr." (Transcript [Docket No. 39]).

SA Voss interviewed the alleged victim and other individuals. (Tr. 42). After conducting these interviews, SA Voss applied for and received a federal search warrant authorizing law enforcement to collect a DNA sample from Defendant. (Tr. 7–8).[7]

On July 7, 2023, SA Voss and Daniel Lasley, a criminal investigator with the Red Lake Reservation Tribal Police Department ("CI Lasley"), went to the Red Lake Transfer Station, Defendant's place of employment, to execute the DNA warrant. (Tr. 8–12).[8] Upon arriving at the Transfer Station, CI Lasley asked an individual at the front desk where Defendant was located, and the individual told CI Lasley to "check out in the back and see if he was there." (Tr. 8–12). SA Voss and CI Lasley went to the rear of the building and located Defendant. (Tr. 8–12). The three of them then reentered the main building. (Tr. 8–12).

Upon reentering the building, CI Lasley asked the individual at the front desk if there was a room where SA Voss, CI Lasley, and Defendant could talk privately, and the individual at the front desk informed CI Lasley that they could use the employee breakroom and they could close the door. (Tr. 8–12). At the November 30, 2023, Motions Hearing, SA Voss described the breakroom as a "typical breakroom" with a table, chairs, a refrigerator, and a sink. (Tr. 8–12). Upon entering the breakroom, SA Voss closed the door, but the door remained unlocked throughout law enforcement's encounter with Defendant. (Tr. 17)

After entering the breakroom, SA Voss informed Defendant of the DNA search warrant. (Tr. 12). Defendant was "very compliant" with the execution of the DNA search warrant, and SA Voss collect the DNA sample. (Tr. 12).

---

[7] Defendant does not challenge this DNA warrant in the present Motion.
[8] SA Voss and CI Lasley were attired in casual civilian clothes, i.e., they were not in law enforcement uniforms. (Tr. 16–18). SA Voss testified that his service weapon was in a holster located inside his waistband and covered by his shirt. (Tr. 16–18). SA Voss further testified that he believed CI Lasley also had a firearm on his person, but SA Voss did not see said firearm. (Tr. 16–18). SA Voss noted, however, that neither he nor CI Lasley ever took out their service weapon during the relevant time period. (Tr. 16–18).

After executing the DNA search warrant, SA Voss indicted to Defendant that SA Voss and CI Lasley wanted to speak with Defendant about why the officers were there. (Tr. 12–14). Defendant responded affirmatively. (Tr. 12–14). At that point in time, SA Voss activated his recording device. (Tr. 12–14).

The three then took seats at the table. SA Voss and CI Lasley sat on the side of the table opposite of Defendant. (Tr. 37). Defendant sat on the side furthest from the door, while SA Voss and CI Lasley sat on the side of the table closest to the door with their backs to the door. (Tr. 37).

SA Voss began the interview by verifying Defendant's name and date of birth. (Gov't's Ex. 1).[9] After SA Voss verified these details, the following exchange took place:

> **SA Voss:** And so this interview, man, you're not in custody at all, okay?
> **Defendant:** Okay.
> **SA Voss:** You're not under arrest.
> **Defendant:** Okay.
> **SA Voss:** You're free to end at any time.
> **Defendant:** Okay.
> **SA Voss:** Okay? You can leave, you can walk out. You can say, "I don't want to talk to you guys anymore." That's totally up to you. I'm not going to read you your Miranda rights, just for those reasons, okay? You're not in custody, you're not under arrest.
> **Defendant:** Okay.
> **SA Voss:** Okay? Make sense?
> **Defendant:** Yes.
> **SA Voss:** Like you see on TV sometimes.
> **Defendant:** Yeah.
> **SA Voss:** You get read your rights right away and stuff like that.
> **Defendant:** Yeah.
> **SA Voss:** Okay. So, we are here to talk to you today.
> **Defendant:** Okay.
> **SA Voss:** About some allegations that were made against you.
> **Defendant:** Okay.

---

[9] Government's Exhibit 1 is a copy of the audio recording of the July 7, 2023, interview involving Defendant, SA Voss, and CI Lasley. (Gov't's Ex. 1). At the Motions Hearing, the Government, without objection, offered the copy of the audio recording into evidence as Government's Exhibit 1. (Tr. 4–5). Citations to this audio recording are provided in the MM:SS format.

12

(Gov't's Ex. 1 00:10–1:12). SA Voss and Defendant then discussed Defendant's employment, his personal circumstances, and other conversational topics ostensibly unrelated to the investigation underlying the present case. (Id. 1:12–19:20). Approximately four minutes into the interview, SA Voss changed the topic of the interview to be the factual circumstances surrounding the allegations underlying the present case. (See Id.). Defendant and SA Voss then continued to discuss the night of the incident. (See Id.).

Approximately nineteen minutes into the interview, Defendant asked, "Can I ask what this is about?" (Id. at 19:20–22:35). SA Voss responded, "Yeah. I'll, I'll explain that too." (Id.). SA Voss then asked whether Defendant remembered speaking to the alleged victim on the night of the incident. (Id.). Defendant indicated that he remembered speaking with her, but he further stated that he could not remember whether he had other interactions with her. (Id.). SA Voss responded indicating that he did not believe Defendant's statements. (Id.). SA Voss then made the following statement,

> I'm going to tell you man, I don't, the FBI doesn't come up here . . for nothing, right? [CI Lasley] doesn't come here for nothing. All right, and that's why we're here today, okay? To talk about what happened between you two. There's some allegations that came out that something happened between you two and it wasn't willing, okay? And that's what I want to get at. You know. A federal judge said, looked at all the stuff that [law enforcement] collected in this case and said, "Yeah, you have, you're good enough for a warrant. You can go collect Jerald's DNA." And what we do in an investigation is I talk to a victim and get her statement. And I talk to all her friends. And then another thing I do is we collect evidence on scenes and then we also look at cameras that are at houses. Cameras pick up a lot of stuff, man. And like we've gone through before you explained everything up in great detail. And then you said you just don't remember. I'm not saying calling you a liar right now, Jerald, but I think you do remember some stuff, okay?

(Id. at 21:23–22:34). While SA Voss made this statement, Defendant intermittently made affirmative noises and said, "okay." (Id.).

Defendant and SA Voss then continued to discuss the night at issue with Defendant providing more details than he had earlier in the interview. (Id. at 22:34–30:50). During this portion of the interview, SA Voss made two relevant assertions. Approximately twenty-seven minutes into the interview, SA Voss explained to Defendant that the investigation had led law enforcement to the conclusion that "something" happened. (Id. at 26:25–27:40). In providing this explanation, SA Voss implied that law enforcement had acquired video evidence of the night at issue. (Id.) ("There's cameras, right? . . . So we can see stuff that happens, all right?"). Approximately, thirty minutes into the interview, SA Voss insinuated that law enforcement had DNA evidence regarding the allegations. (Id. at 29:35–30:40) ("Because you know in the movies, Jerald, DNA, that's why we grabbed it today to confirm stuff. And DNA tells us a lot of stories, man.").

Immediately after SA Voss made the above insinuation regarding DNA evidence, the following exchange took place:

> **Defendant:** Is [alleged victim] underage or what?
> **SA Voss:** Nope. No.
> **Defendant:** No.
> **SA Voss:** No, No. That's not why we're here, okay.
> **Defendant:** So what's the allegation she's making?
> **SA Voss:** What do you think the allegation is?
> **Defendant:** Something fucking awful.
> **SA Voss:** Okay. And what does awful mean to you, man? Just be blunt with me, man. 'cause I'll be real with you. You've been real with me the whole time.
> **Defendant:** I feel like I feel, I should have a lawyer, but
> **SA Voss:** Yeah, if, you know, since you're not, you're not in custody, and I'll explain it to you again. You're more than willing if you don't want to talk to us, but this is your one time to talk to us and get out front of it, Jerald. Because what I do is I take my facts, right? I'm going to take this interview and I'm going to go to the prosecutor, and if they decided to move forward with it or whatever they do, and I can tell them, "You know what, Jerald, Jerald, um Jerald, he was truthful. He realized that some shit happened. He made a mistake, right? But he was truthful, he was truthful with what he told us, okay?" And that goes, that can go a long way with a court. Admitting guilt and admitting fault can go a hell of a long way, dude. Dan and I will both tell you that, okay?

**Defendant:** So you think I, or she believes I raped her?

**SA Voss:** That's the allegation, yep. That, that's the allegation we're at right now, Jerald. So, and like I said, everything Dan and I have collected so far, gone through, phones, DNA, we have all of this stuff and it's leading towards that. And that's why I collected your DNA to confirm it because right now, DNA is telling us a lot of things that happened and it's telling us that that happened, man. Now my thing is Jerald, I want to know, man, is this, and just be cool with me because, you know, you've been

**Defendant:** All right, all right, all right.

(Id. at 30:36–32:40). Defendant denied the allegation, and the three continued discussing the allegations. (Id. at 32:38–36:23).

During this portion of the interview, SA Voss told Defendant that he did not believe Defendant's statements, and SA Voss made additional statements indicating that law enforcement had certain evidence that which contradicted Defendant's statements. Specifically, SA Voss made the following statements:

**SA Voss:** We've got the DNA from the, we've got the DNA from all the other exams that we've done. We've got witness interviews, alright? We got stuff from cell phones, okay? We have stuff from video, okay? That's saying it was not consensual, okay? Screams were heard, alright? That people heard and said, "What the hell is going on?" Alright? Jerald, it wasn't consensual sex, man.
. . .
**SA Voss:** Ok. So if we collect throw up, that would say that it did happen. That she did throw up.
. . .
**SA Voss:** It was all consensual?

**Defendant:** Yes.

**SA Voss:** Okay. Even though we've got witnesses, video, phones, DNA, more DNA, more DNA. You're saying it was consensual? Even after everything? This is your one time man. Because we've gone around and around and around for a while, listened to you talk. If, if I didn't have the evidence to prove it, I wouldn't be here. But I do.

**Defendant:** There's evidence that proves that I raped her?

**SA Voss:** Mm'hm. Yep. And this is, this is your one time to get out in front of it and be truthful with me. So I can go back to the prosecutor and be like, "Yeah, Jerald, at the end of this, he realized he fucked up and he was truthful with us."

(Id. at 36:29–37:06, 39:17–39:25, 42:59–43:56).

SA Voss and Defendant then continued to discuss the circumstances around the allegations against Defendant. At times during the remainder of the interview, Defendant became emotional. (See Id. at 47:02–48:45, 67:08–71:35, 72:04–74:56). Approximately an hour and fifteen minutes into the interview, Defendant can be heard standing up from the table, walking across the room, and getting himself a glass of water at the sink. (Id. at 74:55–75:56).

SA Voss concluded the interview after a total of approximately eighty-nine minutes. (Id. at 88:21). After the conclusion of the interview, SA Voss, observing that Defendant had again become emotional, asked Defendant if he was alright and if he was going to hurt himself. (Tr. 28). Defendant responded that he needed a hug, and SA Voss hugged Defendant. (Tr. 28). Defendant then returned to work. (Tr. 29).

### C. Discussion

As observed above, Defendant seeks to suppress the statements he made to law enforcement during the interview conducted on July 7, 2023, arguing that the statements were procured in violation of Miranda. In support, Defendant argues that the statements should be suppressed because the July 7, 2023, interview was a custodial interrogation, and he was not provided a Miranda warning prior to the interrogation. (Def.'s Mem. [Docket No. 42] at 6–12). Defendant further argues that even if the Court determines he was not in custody from the beginning of the interview, he was "in custody from the point in the interrogation when he tried to stop the questioning to speak to a lawyer and SA Voss pushed aside his attempt to end the interrogation." (Def.'s Mem. [Docket No. 42] at 12–16) (referencing Defendant's statement "I feel like I feel, I should have a lawyer, but" made during the July 7, 2023, interview).[10] In the

---

[10] In his memorandum, Defendant inaccurately quotes his statement as "I feel like I have, I should have a lawyer[.]" (See Def.'s Mem. [Docket No. 42] at 5, 15) (bracketed period in Defendant's memorandum). His use of this inaccurate quotation appears to derive from Defendant's citation to a transcript of the interview rather than the actual audio recording of the interview. (See Id. at 5) (citing transcript rather than the audio recording of the interview

alternative, Defendant argues that it was a violation of his Fifth Amendment right to counsel for SA Voss to continue the interview after Defendant said, "I feel like I feel, I should have a lawyer, but." (Id. at 16–18).

To be subject to suppression under <u>Miranda</u>, a statement must be made while in custody and in response to interrogation. <u>United States v. McGlothen</u>, 556 F.3d 698, 701 (8th Cir. 2009) (citing <u>United States v. Londondio</u>, 420 F.3d 777, 783 (8th Cir. 2005)); <u>Stansbury</u>, 511 U.S. at 322; <u>Miranda</u>, 384 U.S. at 444. The inquiry into whether a person is in custody for purposes of <u>Miranda</u> "turns on whether, given the totality of the circumstances, a reasonable person would have felt at liberty to terminate the interrogation and leave, or . . . to terminate the interrogation and cause the agent to leave." <u>United States v. New</u>, 491 F.3d 369, 373 (8th Cir. 2007) (internal citations omitted).

It is undisputed that the questioning of Defendant by SA Voss and CI Lasley on July 7, 2023, constitutes interrogation. It is further undisputed that neither SA Voss nor CI Lasley advised Defendant of his <u>Miranda</u> rights before the initiation of, or at any point during, the July 7, 2023, interview. Accordingly, the issue before the Court regarding Defendant's July 7, 2023, statements is whether Defendant was in custody for the purpose of <u>Miranda</u> during this interview. <u>See</u> <u>United States v. Axsom</u>, 289 F.3d 496, 500 (8th Cir. 2002).

The Eighth Circuit has outlined six common indicia of custody which tend to either mitigate or aggravate the atmosphere of custodial interrogation:

> The indicia are: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether

submitted as Government's Exhibit 1). The Court will consider Defendant's arguments based on the actual statement made during the July 7, 2023, interview.

strong arm tactics or deceptive stratagems were employed during the questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

The first three indicia are mitigation factors, which, if present, mitigate against the existence of custody at the time of questioning. Conversely, the last three indicia are aggravating factors which, if present, aggravate the existence of custody. [The Eighth Circuit Court of Appeals has] emphasized these six indicia of custody are representative and are not exclusive. A finding of custody does not require the factual circumstance of a case to present all indicia; and a particular strong showing of one factor may compensate for a lesser or non-existent showing of another factor.

Axsom, 289 F.3d at 500–01 (citations omitted). These factors "are not exclusive, and custody cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." United States v. Flores-Sandoval, 474 F.3d 1142, 1147 (8th Cir. 2007) (citations and quotation marks omitted). "The analysis depends upon a review of the totality of the circumstances, and the ultimate test is whether a reasonable person in that position would have felt free to end the interview." United States v. Sanchez, 676 F.3d 627, 630–31 (8th Cir. 2012) (cleaned up).

In the present case, the first factor weighs heavily in favor of finding that Defendant was not in custody for purposes of Miranda. At the beginning of the interview, SA Voss specifically informed Defendant that he was not under arrest, that he was free to leave, and that he was free to end the interview at any time. SA Voss specifically informed Defendant that Defendant could tell the officers that he did not want to talk with them. SA Voss reiterated to Defendant that it was Defendant's decision whether to speak with law enforcement. These circumstances constitute "powerful evidence" that Defendant was not in custody during the July 7, 2023, interview. United States v. Czichray, 378 F.3d 822, 826 (8th Cir. 2004); see e.g., United States v. Ollie, 442 F.3d 1135, 1138 (8th Cir. 2006); United States v. Roberts, 975 F.3d 709, 716 (8th Cir. 2020); United States v. Sandell, 27 F.4th 625, 629 (8th Cir. 2022).

As the Eighth Circuit Court of Appeals as observed, no governing precedent of the United States Supreme Court or the Eighth Circuit Court of Appeals has held "that a person was in custody after being clearly advised of his freedom to leave or terminate questioning." Czichray, 378 F.3d at 826; see, e.g., United States v. Perrin, 659 F.3d 718, 721 (8th Cir. 2011) (noting that the Eighth Circuit Court of Appeals has "never held that a person was in custody after" the person was informed he was free to leave and did not have to answer questions) (emphasis added). "Such a statement provides an induvial with a clear understanding of his or her rights and generally removes any custodial trappings from the question." Ollie, 442 F.3d at 1138. Accordingly, the fact that SA Voss informed Defendant that he was not under arrest, was free to leave, and was free to terminate the interview at any time weighs almost conclusively in favor of finding Defendant was not in custody during the July 7, 2023, interview.

Defendant next argues that even if the Court determines that he was not in custody at the beginning of the interview, he nevertheless transitioned to being in custody when he purportedly attempted to terminate the interview and SA Voss declined to do so. Defendant's argument here is predicated on his assertion that his statement ("I feel like I feel, I should have a lawyer, but") equates to an assertion of his right to remain silent and terminate the interview. (See Def.'s Mem. [Docket No. 42] at 6, 12–16). The Court finds this argument to be unpersuasive.

If an "individual indicates in any manner, at any time prior to or during questioning, that he wishe[s] to remain silent, the interrogation must cease." Miranda, 384 U.S. at 473–74. "[A] person's 'right to cut off questioning'" is central to the Fifth Amendment, and this right must be "scrupulously honored." Michigan v. Mosley, 423 U.S. 96, 103 (1975) (quoting Miranda, 384 U.S. at 474)). "To adequately invoke this right and effectively cut off questioning, a suspect must indicate 'a clear, consistent expression of a desire to remain silent.'" United States v. Johnson, 53

F.3d 947, 955 (8th Cir. 1995) (quoting United States v. Thompson, 866 F.2d 268, 272 (8th Cir. 1989)). A court considers "the defendant's statements as a whole to determine whether they indicate an unequivocal decision to invoke the right to remain silent." Johnson, 53 F.3d at 955. "Indirect, ambiguous, and equivocal statements or assertions of an intent to exercise the right to remain silent are not enough to invoke that right for the purposes of Miranda." United States v. Ferrer-Montoay, 483 F.3d 565, 569 (8th Cir. 2007). The assertion of an individual's right to remain silent so as to terminate an interview must be unambiguous and unequivocal. Simmons v. Bowersox, 235 F.3d 1124, 1131 (8th Cir. 2001).

In the present case, the statement highlighted by Defendant ("I feel like I feel, I should have a lawyer, but") is neither a consistent, unequivocal assertion of his right to remain silent nor an unequivocal termination of the interview. Defendant's use of the terms "feel," "should," and "but" make his statement both ambiguous and equivocal; the use of these terms does not rise to the level of an unambiguous and unequivocal assertion of his right to remain silent. See, e.g., United States v. Lee, No. 3:19-cr-52 (JD/MGG), 2020 WL 416265, at *3 (N.D. Ind. Jan. 27, 2020) (collecting cases), aff'd, No. 21-2216, 2022 WL 193571 (7th Cir. Jan. 21, 2022). In fact, Defendant's statement here is significantly similar to the statement in Davis ("Maybe I should talk to a lawyer") which the Supreme Court determined to be ambiguous and equivocal. Davis v. United States, 512 U.S. 452 (1994).[11] Notably, Defendant fails to highlight any Court in which a vague assertion similar to his here was held to have rendered the interviewee to be in custody for purposes of Miranda. On the record now before it, the Court finds Defendant's argument here to be unpersuasive.

---

[11] Although Davis involved a discussion of the right to counsel, the Davis rule applies equally to a purported assertion of the right to remain silent. See, e.g., Berghuis v. Thompkins, 560 U.S. 370, 381–82 (2010).

The second factor, which addresses whether Defendant possessed freedom of movement during questioning, weighs in favor of finding Defendant was not in custody for the purposes of Miranda. The inquiry here is how the circumstances would have objectively appeared to a reasonable person in Defendant's position with regard to whether his freedom of movement had been restrained "to the degree associated with formal arrest." United States v. Parker, 993 F.3d 595, 603 (8th Cir. 2021) (quoting United States v. Giboney, 863 F.3d 1022, 1028 (8th Cir. 2017)); see United States v. Rosenblum, No. 7-cr-294 (JRT/FLN), 2008 WL 608297, at *5 (D. Minn. Jan. 16, 2008). This inquiry "focus[es] on the restraint imposed by the government agents because '[t]he sole concern of the Fifth Amendment, on which Miranda was based, is governmental coercion.'" United States v. New, 491 F.3d 369, 373 (8th Cir. 2007) (citations omitted); see Axsom, 289 F.3d at 506 ("Our examination only relates to the restraint imposed by the agents.").

On the record now before the Court, there is no indication that SA Voss, CI Lasley, or any other government agent took any action which a reasonable person would have felt impeded Defendant's ability to move about the room or to leave the room. In fact, Defendant did move about the room during the interview with SA Voss and CI Lasley. Defendant stood up from his chair, walked across the breakroom, and made himself a glass of water. Neither SA Voss or CI Lasley made any attempt to impede Defendant from doing so or instructed him that he was prohibited from doing so again. Moreover, Defendant "was never handcuffed or physically or verbally restrained from moving about" which further indicates he "retained his freedom of movement during questioning." United States v. Sandell, 27 F.4th 625, 629 (8th Cir. 2022). Additionally, although the door to the breakroom was closed for privacy, it was not locked. (Tr. 17). For these reasons, the Court finds that this factor weighs in favor of finding Defendant was

not in custody for the purposes of <u>Miranda</u> during the July 7, 2023, interview. <u>See</u> <u>United States v. Laurita</u>, 821 F.3d 1020, 1025 (8th Cir. 2016).

Defendant argues that this second factor weighs in favor of finding that he was in custody for the purposes of <u>Miranda</u> because SA Voss and CI Lasley arrived at Defendant's place of employment unannounced and because SA Voss closed[12] the breakroom door after the three entered the breakroom. The Eighth Circuit Court of Appeals has, however, already rejected this argument. <u>See</u> <u>United States v. Laurita</u>, 821 F.3d 1020, 1025 (8th Cir. 2016) (involving a defendant who the Court determined "possessed unrestrained freedom of movement" when interviewed in small conference room with a closed door and finding that the district court erred in finding that the close door "significantly constrained" defendant's movement). Moreover, law enforcement is not required to provide prearrival notice to an individual that law enforcement will be arriving at said individual's place of employment to conduct an interview of the individual. <u>See</u> <u>Id.</u> at 1022 (explaining that law enforcement went to defendant's place of employment without providing defendant with advanced notice).

The third mitigating factor, whether Defendant initiated contact with law enforcement or voluntarily acquiesced to the questioning by law enforcement, is present and mitigates against the existence of custody at the time of questioning. Although Defendant did not initiate contact with law enforcement, this alone is an insufficient basis to demonstrate an absence of the third mitigating factor. <u>Axsom</u>, 289 F.3d at 502. The third mitigating factor may also be present if a defendant voluntarily acquiesced to the ongoing questioning by law enforcement, as Defendant did in the present case. <u>Axsom</u>, 289 F.3d at 502; <u>Laurita</u>, 821 F.3d at 1025.

The record now before the Court, including Defendant's own words and actions, patently demonstrates that Defendant voluntarily acquiesced to the questions presented by SA Voss and

---

[12] As already noted, the door was not locked. (Tr. 17).

CI Lasley during the July 7, 2023, interview. First, the Court's review of the audio recording of the interview demonstrates that Defendant maintained a cooperative (albeit at times emotional) demeanor, responded appropriately to the questions presented, and maintained a conversational tone. Second, Defendant did not at any point during the interview indicate that he wished for the questioning to cease, even though SA Voss repeatedly advised Defendant of his right to terminate the interview at any time. These considerations mitigate against finding that Defendant was in custody during the July 7, 2023, interview with SA Voss and CI Lasley. Axsom, 289 F.3d at 502; Laurita, 821 F.3d at 1025; Czichray, 378 F.3d at 826.

The fourth factor, addressing whether law enforcement used strong arm tactics or deceptive stratagems against a suspect during the questioning, does not aggravate in favor of finding that Defendant was in custody for the purposes of Miranda during the July 7, 2023, interview. The Court finds no evidence on the present record of strong arm tactics or deceptive stratagems being used against the Defendant during the interview. The officers did not display their weapons, yell at Defendant, or otherwise threaten him in any way; this demonstrates a lack of strong arm tactics. See Axsom, 289 F.3d at 502 (finding no strong arm tactics where officers "did not adopt a threatening posture toward [defendant], display their weapons, or make a physical show of force during the questioning"); United States v. Brown, 990 F.2d 397, 400 (8th Cir. 1993) (finding no strong arm tactics where investigators "did not yell at [defendant], [or] threaten him"). Nor did the officers use any deceptive stratagems, such as the good-cop, bad-cop routine. See Brown, 990 F.2d at 400 (citing "good-cop, bad-cop routine" as example of deceptive stratagem); United States v. Carter, 844 F.2d 368, 372 (8th Cir. 1989). SA Voss and CI Lasley "asked straightforward questions and [Defendant] gave straightforward answers." Axsom, 289

F.3d at 502 (internal quotations omitted). Finally, the officers did not make any specific promises to Defendant. Accordingly, the fourth factor does not support a finding of custody.

Defendant argues that this fourth factor weighs in favor of finding that he was in custody because "SA Voss did not discuss with [Defendant] what the allegations he wanted to talk about that day were until about 20 minutes into the interrogation, and [he] still did not know what the allegations were thirty minutes into the interrogation." (Def.'s Mem. [Docket No. 42] at 10).[13] This argument is unavailing. Courts have consistently found the interview technique described by Defendant—commonly referred to as building rapport—to be a permissible technique and rejected the argument that it demonstrates either a strong arm tactic or deceptive stratagem. See, e.g., United States v. Manning, 361 F. Supp. 3d 839, 849, 849 n.6 (D. Minn. 2019) (citing United States v. Plumman, 409 F.3d 919, 924 (8th Cir. 2005)), aff'd, 833 F. App'x 43 (8th Cir. 2021).

Moreover, even assuming solely for the sake of argument that this rapport building technique could be described as coercive, it is an insufficient basis upon which to conclude that this factor weighs in favor of finding that Defendant was in custody during the July 7, 2023, interview. See, e.g., United States v. Brave Heart, 397 F.3d 1035, 1039–40 (8th Cir. 2005) (providing that "some degree of coercion is part and parcel of the interrogation process" and "the coercive aspects of a police interview are largely irrelevant to the custody determination except

_____

[13] The recitation of facts in Defendant's memorandum demonstrates that he also takes issue with SA Voss's statements during the interview regarding the existence of evidence which did not actual exist; Defendant does not, however, present a corresponding argument on the issue. (See Def.'s Mem. [Docket No. 42] at 5). Specifically, Defendant takes issue with the fact that during the July 7, 2023, interview, SA Voss told Defendant, or at least at a minimum implied, that various evidence had been collect which implicated Defendant in the alleged crime, including DNA, text messages, videos, pictures, vomit, and witness statements indicating that individuals at the scene heard screams from the alleged victim. (Id.). At the November 30, 2023, Motions Hearing, SA Voss testified that he did not have any such evidence. (Tr. 22, 41, 43–46). It is evidence that Defendant interprets these assertions by SA Voss to be a deceptive stratagem. However, this too is an insufficient basis upon which to conclude that this factor weighs in favor of finding Defendant was in custody during the July 7, 2023, interview. Oregon v. Mathiason, 429 U.S. 492, 495–96 (1977) (providing that officer's "false statement" to defendant regarding the existence of evidence "has nothing to do with whether [said defendant] was in custody for the purpose of the Miranda rule"); Ollie, 442 F.3d at 1139; United States v. Thompson, No. 23-cr-211 (JRT/LIB), 2023 WL 9067705, at *9 (D. Minn. Oct. 13, 2023), report and recommendation adopted, 2023 WL 8714481 (D. Minn. Dec. 18, 2023).

where a reasonable person would perceive the coercion as restricting his or her freedom to depart") (quoting United States v. LeBrun, 363 F.3d 715, 721 (8th Cir. 2004)).

The fifth factor, which addresses whether the questioning took place in a "police dominated atmosphere," does not aggravated in favor of finding that Defendant was in custody during the July 7, 2023, interview. "The question is whether the entire context of the questioning, including such considerations as place and length of the interrogation, demonstrates that the course of the [interaction] was police dominated." United States v. Griffin, 922 F.2d 1343, 1352 (8th Cir. 1990). The record now before the Court, including the audio recording of the interview and the testimony of SA Voss, lacks any indication that the July 7, 2023, interview of Defendant by SA Voss and CI Lasley took place in a "police dominated atmosphere."

During the entirety of the interview, SA Voss and CI Lasley maintained a conversational tone and volume which counsels against finding the atmosphere to be "police dominated" to a level commensurate with formal arrest. United States v. Johnson, No. 22-cr-135 (MJD/LIB), 2023 WL 2838103, at *12 (D. Minn. Jan. 13, 2023), report and recommendation adopted as modified, 2023 WL 2675146 (D. Minn. Mar. 29, 2023). Moreover, the July 7, 2023, interview lasted only eighty-nine minutes which weighs against a finding that the interview was "police-dominated" to a level resembling formal arrest. Brave Heart, 397 F.3d at 1040 (noting that when an interview is "not lengthy," it counsels against a finding that the interview was "police-dominated" and citing to cases involving a seven-hour interview and a ninety-eight-minute interview—neither of which were determined to be of sufficient length to render the interaction custodial); United States v. Makes Room, 49 F.3d 410, 415 (8th Cir. 1995) (noting that interrogation lasting more than two hours was not coercive in duration).

Notably, under circumstances substantively analogous to the present case, the Eighth Circuit Court of Appeals has determined that an interview conducted in an employee lounge, breakroom, or conference room at a defendant's place of employment is not a police dominated atmosphere resembling formal arrest. See United States v. Wallace, 323 F.3d 1109, 1113 (8th Cir. 2003) ("The entire event occurred at [defendant's] workplace, a location familiar to [her] and a place she would be comfortable and less threatened."); United States v. Laurita, 821 F.3d 1020, 1027 (8th Cir. 2016) (quoting Wallace). Other Courts in this District have reached this same conclusion—a breakroom at a defendant's place of employment is not typically a police dominated atmosphere. See, e.g., Thompson, 2023 WL 9067705, at *10 (collecting cases).

Defendant argues that the July 7, 2023, interview was conducted in a police dominated atmosphere because SA Voss and CI Lasley arrived at Defendant's place of employment unannounced, walked behind the building to located him, interrupted his workday, directed him back into the building, and directed him into the breakroom without consulting Defendant "about where they would speak." (Def.'s Mem. [Docket No. 42] at 8–10). Defendant interprets these circumstances as demonstrating that SA Voss and CI Lasley had "control" over Defendant. (See Id.).

Defendant's "control" argument is unpersuasive because in circumstances materially similar to the present case, the Eighth Circuit Court of Appeals has found that these same circumstances do not demonstrate that an interview took place in a police dominated atmosphere. See, e.g., Laurita, 821 F.3d at 1027–28. Moreover, even in circumstances involving a significantly higher level of law enforcement control over a defendant than is present in this case, the Eighth Circuit has determined that even that level of control does not render an atmosphere police dominated. See United States v. Czichray, 378 F.3d 822, 825, 828 (8th Cir. 2004)

(involving circumstances where law enforcement arrived at defendant's home unannounced, "told him he needed" to answer the door after he initially declined to do so, instructed him to "call in sick" to work so he could be interviewed, directed him not to inform his office about the interview or investigation when he called, instructed him not to answer the phone when it rang despite it ringing "several times," accompanied him around the house when he attempted to move about the house, and interviewed him for seven hours).

Lastly, the sixth factor, addressing whether Defendant was arrested at the end of the interview, fails to aggravate in favor of finding that Defendant was in custody during the July 7, 2023, interview. In the present case, Defendant was in fact <u>not</u> arrested upon the conclusion of the interview. Likewise, at no time before, during, or after the interview was Defendant ever even handcuffed by law enforcement officers. At the conclusion of the interview, SA Voss and CI Lasley left Defendant's place of employment and Defendant returned to work.[14]

Upon consideration of the totality of the circumstance, the Court concludes that a reasonable person in Defendant's position would have objectively felt free to terminate the July 7, 2023, interview at any time, and as such, Defendant was <u>not</u> in custody during the July 7, 2023, interview.[15] Thus, law enforcement officers were not constitutionally required to provide Defendant with a <u>Miranda</u> warning prior to the July 7, 2023, interview at his workplace.

---

[14] In fact, Defendant himself requested and received a hug from SA Voss at the conclusion of the interview. (Tr. 28).

[15] Because the Court concludes that Defendant was not in custody during the July 7, 2023, interview, the Court need not consider Defendant's argument that the latter sixty minutes of the July 7, 2023, interview should be suppressed because SA Voss failed to scrupulously honor Defendant's right to counsel by continuing the interview after Defendant said, "I feel like I feel, I should have a lawyer, but." <u>See, e.g.</u>, <u>United States v. Flynn</u>, No. 16-cr-347 (ADM/KMM), 2017 WL 8947195, at *9 (D. Minn. Aug. 11, 2017) (citing <u>United States v. Muhlenbruch</u>, 634 F.3d 987, 997 (8th Cir. 2011); <u>United States v. Fitterer</u>, 710 F.2d 1328, 1333 (8th Cir. 1983)), <u>report and recommendation adopted</u>, 2017 WL 5462184 (D. Minn. Nov. 14, 2017). Moreover, even if the Court were to consider this argument, Defendant's assertion ("I feel like I feel, I should have a lawyer, but") is not an unequivocal and unambiguous assertion of his right to counsel sufficient to require SA Voss to immediately terminate the interview. <u>See, e.g.</u>, <u>Davis v. United States</u>, 512 U.S. 452, 459–62 (1994); <u>United States v. Havlik</u>, 710 F.3d 818, 821 (8th Cir. 2013); <u>United States v. Mohr</u>, 772 F.3d 1143, 1146 (8th Cir. 2014); <u>Lee</u>, 2020 WL 416265, at *3; <u>United States v. Mays</u>, 683 F. App'x 427, 433 (6th Cir. 2017).

In summation, Defendant was not in custody for the purposes of <u>Miranda</u> during the interview on July 7, 2023, and Defendant's statements during the interview were voluntary. Consequently, Defendant is not entitled to have the statements he made during this interview suppressed.

Therefore, to the extent Defendant's Motion to Suppress Statements, [Docket No. 24], seeks an Order of this Court suppressing Defendant's statements made during the July 7, 2023, interview, the undersigned recommends that Defendant's Motion to Suppress Statements, [Docket No. 24], be **DENIED**.

## IX.    Conclusion

Therefore, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED THAT**:

1.  The Government's Motion for Discovery, [Docket No. 17], is **GRANTED**, as set forth herein;

2.  Defendant's Motion for Disclosure of 404(b) Evidence, [Docket No. 25], is **GRANTED**, as set forth herein;

3.  Defendant's Motion for Early Disclosure of Jencks Act Material, [Docket No. 26], is **DENIED**;

4.  Defendant's Motion for Discovery and Inspection, [Docket No. 27], is **GRANTED**, as set forth herein;

5.  Defendant's Motion for Government Agents to Retain Rough Notes and Evidence, [Docket No. 28], is **GRANTED**, as set forth herein;

6.  Defendant's Motion for Rule 16 Discovery Regarding Forensic Testing, [Docket No. 29], is **GRANTED**, as set forth herein; and

7. Defendant's Motion to Compel Attorney for the Government to Disclose Evidence Favorable to the Defendant, [Docket No. 30], is **GRANTED**, as set forth herein.

Furthermore, based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT** Defendant's Motion to Suppress Statements, [Docket No. 24], be **DENIED**.

Dated: February 15, 2024                                         s/Leo I. Brisbois
                                                                Hon. Leo I. Brisbois
                                                                U.S. MAGISTRATE JUDGE

# N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]" A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing. If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.